The final case on the calendar for oral argument today is United States v. Hovhannisian. Good morning. May it please the court. I'm Brad Henry. I represent the appellant v. Hovhannisian. In this case, I've reserved one minute for rebuttal. Mr. Hovhannisian has filed this bail review application with the court because we believe that the lower court clearly erred in denying Mr. Hovhannisian bail in this case. Could you just take a moment to describe the terms that you believe would be sufficient to satisfy the statute's needs? Of course, Your Honor. In terms of the bail package that we proposed in the court below, it was, I believe, $150,000 personal recognizance bond signed by three financially responsible individuals, home detention with electronic monitoring. In California or in Florida or where? In California. So his intention would be to go back to California with his parents where his wife and children are currently living. So they came back from Florida? They did. Okay, so it would be electronic monitoring and living at home in California? Correct. And the $150,000? That's correct, Your Honor, and then other standard conditions of pre-trial release. Thank you. Please go ahead. Thank you. In terms of the arguments in bail, Judge Forrest and the government and I, on behalf of my client, really honed in on a clearly defined sphere of issues that we focused on in terms of whether Mr. Hovhannisian is a flight risk or not. Those included, obviously, the seriousness of the offense, the potential sentence in this case and whether that motivated him to potentially flee, his potential access to fake identification. There was an issue about the Armenian passport at the first hearing before Judge Forrest. I believe we cleared up in the second hearing with Judge Forrest. His Armenian passport has expired, I think, in 2003. At what age was he when he came here? 15 years old. So how old is he now? He's in his early 30s. Yes, he's in his 30s. Correct. And he does have a risk of deportability, right, if there's an adverse finding? There is, Your Honor. Yes, he's an LPR. He's a legal permanent resident in the U.S., yes. So there is certainly a risk of deportation in this case. His ties to the community, the court originally said he has no ties to Florida, which I think is probably true. He'd only lived there for a short period of time before his arrest. He certainly has a number of ties to California. The second hearing had said, well, based on that, he has no ties to any single community. He'd been gone from California for over three years, right? That's correct. He had lived in Las Vegas for quite a period of time and then moved to Miami. He had just moved to Miami shortly before his arrest, but his intention was to stay there. Part of what influenced Judge Forrest's decision, according to what she said, is that it was the nature of the offense as well as the strength of the government's proof of the offense, which was the false identity scheme. And part of your answer seemed to be, well, everyone that's involved in that's been arrested, so he doesn't have access anymore to fraudulent... Well, I think that's true. The proof that the government put forward was that, and there was another hearing in terms of co-defendant Savgir, who was the individual under this conspiracy who was responsible for making the fake identifications, which allegedly were then given to my client, which my client then distributed to a team of individuals who went and cashed checks with those according to the government's proof. Mr. Savgir is detained. All of his equipment at the hearing, the government actually brought it in. This would be a larger organization in which your client is alleged to have played a leading role. Well, I think it is a large organization, but the organization included, you know, not only this credit card cashing scheme, but there were other unrelated to my client. My client is involved in this check cashing scheme by which Mr. Savgir was the known individual who was providing identifications for that scheme. There is no other person that they appointed to... He had false ID in his possession for himself, right, at the time that he was arrested. It was a credit card under a different name, correct. But that's not identification. That wouldn't be something that he could use to perpetrate a check cashing scheme with which he's been alleged to have committed. And so under him... I see I'm out of time, so unless the court has a question. Why doesn't the risk of deportation substantially undercut ties to the community? That is to say, if I'm a United States citizen and I have really nowhere else to go, and I can stay here where I have ties to the community, even if I'm convicted, even if I go to a very different situation, isn't it then someone who, if he is convicted, has a substantial risk of losing those ties anyway? It seems to me in that circumstance, if you look at what are the incentives to flee, they're much more dramatic. Even if I don't want to go to Armenia and I'd like to stay here, if I look at the situation realistically and think that I'm facing not just a prison term, but at the end of the prison term being sent to Armenia anyway, doesn't... I may have some nice ties to California, but does that cut it in these circumstances? Well, I think the court can look through a couple of things. I agree. There is always an individual who wants to stay in the U.S. who is risking deportation. There is always at least a small amount of incentive to do something which you wouldn't under ordinary circumstances do, in this case flee. But looking at Mr. Hovnesian's historic actions, he's faced criminal prosecution in the past, of which he didn't flee. I don't know whether they were deportable offenses or not, but he showed up when he was supposed to. He resolved those cases like he was supposed to. So that gives us at least some historical indication that he'll come back and do what he needs to do. I think the second sort of factor in that is, it sort of cuts both ways, I think. But in terms of his fleeing to get away from the prosecution, you know, the ties to the community and the ties to what he's doing, if he were to flee, I think he recognizes that, you know, then he's in double trouble in any event, right? And so it's, you know, there's the fleeing out of the country, which he certainly, number one, he can't do it because he doesn't have a passport, right? Unless some extraordinary something happens, which is unlikely. If he was to flee within the country, it's, I think he understands. He loses the case, he's got no chance. He is absolutely deportable. If he wins the case, then he's not going to be deported. That's correct. So he's got to win the case. That's correct. That's his only option. If he has a high degree of confidence that he'll win, he'll stay. But if he has a low degree of confidence as to his ability in the trial, he has a pretty good incentive to disappear. I mean, I think that does... He's got strong ties to the community. That does. That does. That's why his children, living with his parents, provide that attraction to make him stay. But if he doesn't have a high degree that he'll win, a high degree of confidence that he'll win, he knows it's a short-time thing. But on the same token, if he knows that deportation is the result of the case and he were to flee and then be away from his family and children, right, it's not the being kicked out of the U.S. necessarily, although this has been his home since he's been 15 years old, that is probably the problem. I think it is being away from his family and those who he loves. You can make a life anywhere, right, if he were to... If Orest made all these calculations, what's our standard? Is she clearly at error? Yeah, I think it's a... I think the standard that I cite in the brief is a mixed question of law and fact under clear error. Well, these are factual determinants. That's correct. And I believe she clearly erred in this case. Clear error. That's correct. It's a tough standard. It is a tough standard. She's considering all these in a balance. It comes up with a view that no condition or set of conditions can assure that he won't flee. It's tough for you to overcome. It's tough. I agree with the court. It is tough to overcome. But if the court looks at the Himmler case, which not all the factors are exactly the same, but there are a number of similar factors, particularly in terms of the weight of the evidence against the defendant and the access or potential to get access to identification documents, in that case, particularly passports, and then the court goes back and overturns the lower court on that. If you identify one factor that you think that a district court misapprehended, what would that be? Or assigned too much weight to as... I mean, thinking in the realm of clear error. I mean, assessing a mix, an impressionistic mix is something else. I think she misapprehended really two things. One is I have a strong issue with the access to false identifications. That's clear error simply because there is other than an assumption with no basis that he's able to go and get some fake ID somewhere. Mr. Savgir, who the evidence said and the government presented as the person who made those fake identifications, is in detention. They have his equipment for making that. You think he has no other ties in that kind of fake ID world? I don't, and there is no proof of that. So I think that's both of those. I think the other issue is this risk of flight because he has no ties to the community. But the argument is the guy who was working with the defendant is no longer free. So by implication, he can't falsify any other documents, like falsify a passport. Because this collaborator is not there. That's correct. Judge Forrest thought that his access would still be there because there'd be others. Yet, there isn't the underworld community of false identifications. Again, that's an assumption. The proof in the case presented by the government is . . . You argue that would be clear error? I believe that would be clear error. All right, why don't we hear from the . . . Oh, I'm sorry. No. Are you . . . Do you have anything further? No, that's . . . Okay. Why don't we hear from the government? Thank you. I may please the court. My name is Andrew Thomas, and I represent the United States. The defendant has used false identities to obtain money and property from others. He's done it in multiple cities around the United States, and he's done it in connection with a sweeping organization that involves lots of persons and ties to Eastern Europe. So, in light of that context, and in light of the fact of a guilty plea causing the near-certain deportation of the defendant, Judge Forrest did not clearly err, or err at all, in finding that there was a risk of flight in the first instance, and second, that that risk could not be addressed through other measures short of detention. What did Judge Forrest have before her regarding access to other individuals since the co-conspirator had been detained already? Sure. So, I can speak to that with a little context. It's true Mr. Savgir was producing photo identifications. The way the scheme worked and the way it worked for this defendant is they would email images of themselves with the biographical data of the identity that they wished to assume to Mr. Savgir, and he would turn that into a license. One of the things at the hearing that Mr. Henry referenced we found was a guidebook essentially to creating identities for each of the 50 states. Mr. Savgir was creating photo identities, usually driver's licenses. One of the things this defendant had on him and that others carried and used in connection with the scheme were other types of identifying documents. This defendant was connected to the cargo theft scheme. That cargo theft scheme involved impersonating an entire company. They would go pick up shipments. The defendant appears to have created false invoices and also a corporate identity and changed identifying information on a website in order to assume that identity. Separate still, the defendant was found with a Fleet One debit card that was in the name of a fake name. I think in this case it was Dmitry Dragunov. And so the nature of the false documents isn't restricted just to what Mr. Savgir has. So that's... So you're saying there were other false identity documents and at least as far as the government is aware there is no proof that those came from the same person who is the co-conspirator that your adversary referred to? Yes. The first point, Your Honor, is that false driver's licenses are not the entire universe of false documents. And more than just an absence of evidence that Mr. Savgir produced these other false financial documents, there is affirmative proof that the Miami conspirators, particularly Mr. Suyanov, were manufacturing credit cards or other financial instruments there. Mr. Suyanov was stopped with a magnetic stripe encoder. But he's also detained. He is, Your Honor. But the reason that that's relevant is twofold, which would be my third point. The folks who are not detained, including this defendant, then go from Miami to Las Vegas where they continue the scheme, request new identities and keep going forward. Not just those two, Mr. Suyanov and Mr. Savgir were involved. This defendant was a manager. Some of the folks that he was managing were present with him in the hotel room when he was arrested. Those folks are still at liberty. So that's an additional set of persons. There are other conspirators, known and unknown, as the indictments say. Some of whom, and there's no proof from this record, there's no necessary reason to believe that all of the false identification documents used in all of these schemes came from the particular individuals who are detained. That's correct, Your Honor. And if I may, I see my time has expired. But can I make one point? We'll take a little bit more. There's even reason to believe with respect to this defendant that there is an identity that has not been seized from him. So although I do think that it certainly isn't clear error for the judge to have found below that there is access. There's an identity that's not been seized from him? You mean he has other documents someplace that? Yes, if I may explain. So in this particular circumstance, the record before the district judge showed that one of the emails that was sent for this identity, Dmitry Dragunov, was to create from Mr. Savgir photo identification. And there's records that that packet, I think in that order, it was seven different identifications were created and sent off. When this defendant was arrested, that identity name was on a Fleet One debit card, but the photo identification was not recovered and was not recovered in any of the other search locations. So in addition to the general risk that this defendant has ongoing access to co-conspirators who have in the past used and obtained identities, there is an identity presumably with his image that got created by Mr. Savgir that is still out there waiting for him to use. Let me ask another question. I had the impression from Judge Forrest's comments that she was concerned also, even if these other factors weren't at play, she was concerned about having the defendant in home detention in a community so far from here. Is that particularly difficult? Should that be a disqualifier from bail? No, Your Honor, but I think it's something that's assessed both in the context of the case and this defendant, as well as the sort of proportional balancing between motive to flee and his ability to do so. And the way that that- Do you think it is a concern to be included in the list of factors in determining the risk of flight? Yes, Your Honor, for at least two specific reasons with respect to this defendant. One is that Los Angeles is not a place that he's been recently. The government's proof was that he was last in Los Angeles in connection with the scheme, with the quote, the Armenian crew, as we refer to it there. So his connections to Los Angeles are troubling on their face in the present moment. But second, if the proposal, as I understand it, is to put him on electronic monitoring, what that does is bake in a recurring set of repeating opportunities for flight where pretrial won't know for five to seven hours where the defendant is, and fingers crossed that when he leaves LAX, he lands in New York under the same- Anyone who is in home detention will sometimes have to leave to come to the courthouse to see his lawyer for other purposes that are allowed, but that usually doesn't involve transcontinental flights and spending a lot of time in airports while you are theoretically being monitored.  That's right, Your Honor. Yes, this case is distinct from other circumstances where home detention may be appropriate. And am I right that Judge Forrest didn't rest her final determination on risk of harm to the community? She did not. It was just on risk of flight. That's correct, Your Honor. Thank you very much. Thank you, Your Honor. Mr. Hoover, you have a minute at the bottom. Thank you, Your Honor. In terms of these alleged- which, by the way, aren't in the record before the court, nonetheless- potential IDs or identifications which may be out there, I would say I haven't seen the email. The email is not included here necessarily. It's been provided in discovery. Requesting the Dragunov documentation. He did have a credit card, presumably with the name Dragunov. On it, in the same instance, it's not an identification document. In terms of risk of flight, which is what we are looking at, and the court just pointed this out, not looking at danger to the community. In terms of risk of flight, none of those other documents. An ID, you need to flee. A passport, you need to flee. A credit card could be used to buy certain things, but you could just as easily do that under your own name cash. None of those identifications make it more likely than not that he is going to flee in this circumstance. Again, while a number of these factors can certainly cut both ways, that's true in every case, I think there are conditions or a combination of conditions in this case, which the judge did not find, but I believe clearly erred in not finding, that would ensure that Mr. Ognison wouldn't reappear and face these charges. Thank you very much. Thank you for your arguments. We'll take the matter under advisement and try to get your decision promptly. The clerk will please adjourn court.